UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SANTA ROSA MALL, LLC,

                              Appellant,

v.

SEARS HOLDINGS CORPORATION,
et al.,

                              Appellees.
-----------------------------------------------------------X

**MEMORANDUM OPINION AND ORDER**

20-CV-03923 (PMH)

PHILIP M. HALPERN, United States District Judge:

Santa Rosa Mall, LLC ("Appellant" or the "Landlord") appeals from an Order of the Honorable Robert D. Drain, United States Bankruptcy Judge, dated April 30, 2020 (the "Order"), which denied Appellant's Motion for an Order Finding the Automatic Stay Inapplicable or, in the Alternative, for Relief from the Automatic Stay ("Third Motion for Relief from Stay"). (Doc. 1; APX2369).[1] For the reasons set forth herein, the Order is AFFIRMED.

## BACKGROUND

Appellant is a retail landlord in Bayamón, Puerto Rico. Its tenant SR – Rover de Puerto Rico, LLC f/k/a Sears Roebuck de Puerto Rico, Inc. (the "Tenant"), a subsidiary of Sears Holdings Corporation d/b/a Sears Roebuck and Co. (the "Parent" and collectively, the "Debtors")[2] leased and operated a store ("Store No. 1915") pursuant to a Lease Agreement with the Landlord dated September 16, 1965 (the "Lease"). (APX1478). In 2017, Hurricanes Irma and Maria damaged Store No. 1915. The Tenant then closed its doors thereafter and has remained in ill-repair since.

---

[1] For ease of reference in this Memorandum Opinion and Order, the Court cites to the appendix of record on appeal using the appendix's numbering format: "APX0001." The appendix is filed on the ECF docket at Doc. 13-1—13-18, and 17-1.

[2] In addition to Sears Holdings and Sears Puerto Rico, there are approximately fifty other debtors in these Chapter 11 cases. They are listed in full, together with the last four digits of each debtor's federal tax identification number, in the Order. (APX2369, n.1).

The Lease provided, as relevant to this appeal, that the Tenant was obligated to maintain insurance with respect to Store No. 1915 through an insurance company or through the Parent as self-insurer. (APX1506-07 (§ 6.01)). The Lease provided further that should Store No. 1915 be damaged in an amount greater than $100,000, by "fire or other insured casualty, then" the insurance proceeds were to be deposited in a specified account in the Landlord's name. (APX1508 (§ 6.03)). Finally, in the event of self-insurance by the Parent, the Lease provided that the Tenant was required to repair, restore, or rebuild upon the damage to, or destruction of, Store No. 1915. (APX1509 ((§ 6.04)). Here, the Tenant did not maintain its own insurance policy; and the Parent did not self-insure.

At the time of the Hurricanes, the Parent had an insurance policy covering property damage to Store No. 1915 (the "Insurance Policy"). (APX1545). The Insurance Policy named the Parent as the "Insured." (*id*.; APX1547). It provided that "all adjusted claims . . . shall be paid to the Insured or its order . . . " and "[l]oss, if any, shall be adjusted with and payable to [the Parent] or as directed by it." (APX1567 (¶ 19); APX1574 (¶ 53)). On September 8, 2017 and September 28, 2017, in connection with the Hurricanes, respectively, the Parent submitted claims under the Insurance Policy. (APX0097; APX1624).

On October 25, 2017, the Landlord obtained a "Certificate of Property Insurance" produced by Aon Risk Services, Inc. ("Aon"), the company authorized to issue certificates of insurance under the Insurance Policy (APX1571), naming AIG Europe Limited as the insurer (together with certain other insurers, the "Underwriters"), and the Parent as the insured. (APX1613). The Certificate also listed the Landlord as a "loss payee in accordance with the policy provisions of the [Insurance Policy]." (APX1615). On October 30, 2017, the Landlord's managing agent wrote to the Underwriters requesting to be informed of the filing and processing of any claim under the

Insurance Policy, and that any insurance proceeds be deposited "as required by the Lease Agreement." (APX1620). Appellant did not receive any response.

The Underwriters, with regard to the Parent's claim, made payments over time in installments directly to the Debtors totaling $46,332,916. (APX1624). On October 15, 2018, the Debtors filed their petition for relief under Chapter 11 of the Bankruptcy Code and suspended initial reconstruction efforts of Store No. 1915. On January 17, 2019, because the Underwriters disputed the nature, scope, extent, and amount of certain of the losses and damages claimed, and disputed their responsibility to cover those losses and damages, after extensive negotiations, the Debtors and the Underwriters agreed to settle their claims (the "Settlement Agreement"). (APX1625). Under the Settlement Agreement and, in exchange for the settlement amount of $13,260,122, the Debtors released the Underwriters from "any and all claims that were made, could have been made, or could be made in the future relating to or arising out of" the Insurance Policy relating to the Hurricanes. The Debtors further agreed to, *inter alia*, indemnify and defend the Underwriters in any action under the Insurance Policy relating to Store No. 1915 and the Hurricanes brought by "any other person, including but not limited to . . . landlord(s)." (APX1625-1626 (¶¶ 3-6)). The total settlement amount was paid directly to the Debtors.

The insurance proceeds became part of the Debtors' bankruptcy estate and were not deposited in a specified account in the Landlord's name under § 6.03(b)(3) of the Lease Agreement. Appellant's position is that the Underwriters should have deposited the insurance proceeds in a specified account in the Landlord's name instead of paying it over to the Debtors. It therefore proposes to commence an action against the Underwriters under Puerto Rican law as a "loss payee," their designation as listed on the Certificate of Insurance. Appellant has unsuccessfully moved twice to vacate the automatic stay, although the Debtors stipulated to lift

the stay to permit Appellant to pursue a claim against Aon, only. That claim was based upon the issuance of the Certificate of Insurance and was brought to pursue claims against the insurance broker for damages. (APX1444). The stipulation authorizing the action was signed before the Landlord made the Third Motion for Relief from Stay. (APX1450). The Bankruptcy Court denied the Third Motion for Relief from Stay, holding, *inter alia*, that the automatic stay applies to the proposed action against the Underwriters, and that Appellant failed to show cause for relief from the stay. (APX1995; APX2197). On May 20, 2020, Appellant appealed the Order to this Court. (Doc. 1). The appeal was fully briefed on September 20, 2020. (Doc. 13, "App. Br."; Doc. 17, "Debtor Br."; Doc. 18, "Reply Br.").[3]

## STANDARD OF REVIEW

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges." 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions *de novo*. *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009); *Morillo v. Wells Fargo Bank, N.A.*, No. 19-CV-08183, 2020 WL 2539068, at *2 (S.D.N.Y. May 19, 2020). "A bankruptcy court's exercise of equitable discretion—such as its determination on a motion to lift the automatic stay—is reviewed for abuse of discretion." *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 19 (S.D.N.Y. 2012) (citing *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart*

---

[3] Appellant, in its Brief, requested oral argument pursuant to Federal Rule of Bankruptcy Procedure 8019(a). Upon examination of the briefs and record in this case, the Court has determined that oral argument is unnecessary because the facts and legal arguments are adequately presented and the decisional process would not be significantly aided by oral argument. Fed. R. Bank. P. 8019(b)(3).

*Convenience Stores, Inc.)*, 351 F.3d 86, 91 (2d Cir. 2003)). "An abuse of discretion may consist of an error of law or a clearly erroneous finding of fact, or a decision that, though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions." *Id*. (*quoting Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 145 (2d Cir. 2009)).

## ANALYSIS

Appellant contends that the Bankruptcy Court abused its discretion in denying the Third Motion for Relief from Stay. To that end, Appellant argues that the Bankruptcy Court erred in determining that: (1) the Settlement Agreement is enforceable; (2) the Landlord's proposed action against the Underwriters would adversely impact the Debtors' bankruptcy estate as an administrative expense claim; (3) the protection of the automatic stay is applicable to a non-debtor third party; and (4) Appellant did not show cause for relief from the stay. (*See generally* App. Br.).

The Debtors maintain that the Bankruptcy Court correctly denied the Third Motion for Relief from Stay and that "[Appellant's] proposed action against the Underwriters is merely a disguised attempt to enhance its recovery against the Debtors at the expense of other similarly situated creditors." (Debtors Br. at 12). The Debtors contend that Appellant is simply unsatisfied with the potential recovery on their claim filed in the bankruptcy proceeding associated with the cost of repairing Store No. 1915. Appellant's strategy, the Debtors argue, is to jump ahead of the other general unsecured creditors of the Debtors to recover in full from the Underwriters, without regard to the fact that the Debtors would be responsible to defend any such lawsuit and indemnify the Underwriters for any judgment entered against them. Regardless of the motive, the Debtors argue that the Bankruptcy Court correctly determined each of the questions raised herein by Appellant.

5

Case 7:20-cv-03923-PMH   Document 19   Filed 09/27/21   Page 6 of 15

### I. The Settlement Agreement is Enforceable

The Bankruptcy Court's Order finding the automatic stay applicable and declining to lift it to permit Appellant to pursue an action against the Underwriters relies upon certain other findings, the principal one being the enforceability of the Settlement Agreement. Appellant argues that the Debtors failed to comply with Federal Rule of Bankruptcy Procedure 9019(a) and Second Circuit precedent with respect to court approval prior to executing the Settlement Agreement. Because there was no court approval of the Settlement Agreement, Appellant argues, the settlement is null and void. The Debtors maintain that Rule 9019 does not apply because the Settlement Agreement was reached in the ordinary course of business.[4]

The Bankruptcy Code provides that a debtor may enter into transactions involving property of the estate in the ordinary course of the debtor's business without first seeking court approval, 11 U.S.C. § 363(c)(1). A rule of procedure, such as Rule 9019, does not supersede the clear language of the Bankruptcy Code. *See* 28 U.S.C. § 2075 (Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right"); *Dombroff v. Greene (In re Dombroff)*, 192 B.R. 615, 621 (S.D.N.Y. 1996) (Section 2075, "unlike the Rules Enabling Act, contains no language providing that bankruptcy rules supersede conflicting prior statutes"). Appellant concedes that "Section 363(c)(1) indeed permits a debtor-in-possession to enter into transactions involving property of the estate in the ordinary course of the debtor's business without first seeking court approval." (Reply Br. at 6). Thus, the Bankruptcy Court correctly ruled that if the Settlement Agreement was executed in the ordinary course of business, court approval of it was not required.

The Bankruptcy Code does not define "ordinary course of business." Thus, to determine whether a settlement agreement was made in the ordinary course of business, courts apply two

---

[4] The Debtors argue alternatively that the Court could dismiss Appellant's argument on grounds of equitable mootness. (Debtors Br. at 23 n.5). Given the Court's determinations herein, it does not reach this argument.

tests: (1) the industry-wide test, referred to as the "horizontal test," which focuses on "whether, from an industry-wide perspective, the transaction is the sort commonly undertaken by companies in that industry," and (2) the creditor's expectation test, referred to as the "vertical test," which focuses on "whether the transaction in question subjects a hypothetical creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Leslie Fay Comp. Inc.*, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994). "In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to its course of conduct postpetition." *Id*.

The Court defers to the Bankruptcy Court's findings in determining that the Settlement Agreement was made in the ordinary course of business. Indeed, Appellant does not dispute that, prepetition, the Debtors regularly filed and settled property damage insurance claims in the ordinary course of business, including for claims ranging up to millions of dollars for hurricane damage. (*See* APX1736). The Debtors regularly entered into release, proof of loss, and settlement agreements with their insurers over such claims. (*Id*.). Appellant argues that the magnitude of the claim for damages caused by the Hurricanes made the Settlement Agreement extraordinary; but it is inaccurate to argue that the Settlement Agreement was not made in the ordinary course simply because of the amount of the claim. "The standard for whether a transaction is in the ordinary course looks at the type of transaction," not whether the amount of money exchanged was typical of past practices. *See O'Neil v. New Eng. Rd., Inc.*, 593 B.R. 100, 152-53 (Bankr. D. Conn. 2018). Appellant, in reply, contends that the vertical test remains unaddressed and unsatisfied because the Landlord and Tenant agreed to, in effect, a definition of the amount that would be considered to be in the ordinary course of their dealings: the insurance proceeds on account of any damage to

Store No. 1915 over $100,000 was to be deposited in a special account in the name of the Landlord. (APX1508 (§ 6.03)).

The Court does not read § 6.03 of the Lease to suggest a dollar figure for what amount the Landlord, as a creditor in Tenant's bankruptcy, considers a compromised insurance claim to be within the ordinary course of business. Such words do not appear in that section, nor does it concern resolution of insurance claims between the Parent and the insurer. "Under the vertical test, the court views the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to enter into a contract with the debtor." *In re Lavigne*, 114 F.3d 379, 384-85 (2d Cir. 1997); *see also In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *aff'd*, 690 Fed. App'x 761 (2d Cir. 2017) (summary order). There is no clear error in a finding that the Debtors' creditors would expect to repaid from the assets of the estate; and a creditor should expect these Debtors to resolve property damage insurance claims by settlement, instead of protracted disputes and possible litigation concerning the losses and damage claimed and the insurer's responsibility for covering same. Moreover, the Debtors note that two groups of creditors holding large claims against the Debtors' estates, prior to execution of the Settlement Agreement, confirmed the Debtors' view that the Settlement Agreement was within its ordinary course of business. (APX1732). Under these circumstances, in which the Settlement Agreement was made in the ordinary course, not requiring notice, a hearing, and court approval, the Bankruptcy Court held correctly that the Settlement Agreement is enforceable.

### II. Landlord's Proposed Lawsuit Against the Underwriters

Appellant argues that its proposed action against the Underwriters would not adversely impact the Debtors' bankruptcy estate because the indemnity clause would not be triggered by the

lawsuit; and, assuming but not conceding that the defense and indemnity obligation is enforceable and would be triggered by the lawsuit, any defense costs, verdict, or settlement would be treated as an unsecured claim and not an administrative expense.

### A. The Proposed Lawsuit Triggers the Indemnity Provision

Appellant's proposed lawsuit against the Underwriters is described as a First-Party property insurance claim under Puerto Rico Insurance law. (App. Br. at 18-25). Under Puerto Rico law, Appellant argues, the Underwriters incorrectly paid the Debtors instead of Appellant and should now have to pay twice to remedy the error. The gravamen of this issue on appeal is whether Appellant's proposed lawsuit would trigger the Debtors' defense and indemnification obligations under the Settlement Agreement.

The Debtors agreed, in exchange for the $13,260,122 settlement payment, to release the Underwriters from, *inter alia*, any and all claims under the Insurance Policy relating to or arising out of the claim concerning, and losses from, the Hurricanes. The Settlement Agreement's indemnity clause provides that:

> [The Debtors] agree[ ] to hold harmless, indemnify, and defend the [Underwriters] from any and all actions, demands, and claims under the [Insurance Policy] which [the Debtors], or any mortgagee, co-owner, coinsured, additional insured, and/or loss payee, assignee, or subrogee of [the Debtors] or any other person, including but not limited to owners(s) and/or landlord(s) of any of [the Debtors'] properties, may assert at a later date arising out of the matters herein released.

(APX1626 (¶ 6)).

Appellant bases its right to sue on its alleged status as a loss payee under the Insurance Policy and Certificate of Insurance issued by Aon. It argues that an insured has a right to bring a claim for property damage in a direct action against the insurer "[u]nder a property insurance policy," (App. Br. at 18), and characterizes its proposed claim as "a property insurance claim

9

wherein the Underwriters have already admitted coverage for the loss, [and] the only issue pending is if they paid the correct amount to the correct party" (*id*. at 15). Appellants cite to the Underwriters' breach of their obligations under the Insurance Policy as the basis for the action. (*Id*. at 15-16). Despite its arguments to the contrary, fully briefed and argued at length before the Bankruptcy Court (*see* APX1995; APX2197), Appellant has not shown that this proposed claim is independent of the Insurance Policy. Appellant's "independent cause of action" arises out of the Insurance Policy and concerns losses resulting from the Hurricanes. The Bankruptcy Court concluded correctly that the Debtors' defense and indemnity obligations in the Settlement Agreement would be triggered by such a lawsuit.

B. <u>The Indemnity Provision Is an Administrative Expense</u>

Appellant argues that even if the indemnity provision of the Settlement Agreement is enforceable, it would not adversely impact the Debtors' bankruptcy estate as an administrative expense claim. A general unsecured claim against the Debtors is paid cents on the dollar, whereas an administrative expense claim is paid at a rate of 100 cents on the dollar. (*See* APX1314). This administrative priority is granted to "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §§ 503(b)(1)(A), 507(a). A claim satisfies that standard where: (1) it "arose from a transaction with or on account of consideration furnished to the debtor-in-possession"; and (2) "the transaction or consideration directly benefited the debtor-in-possession." *In re Kuvykin*, No. 18-BK-10760, 2018 WL 4191854, at *3 (Bankr. S.D.N.Y. Aug. 31, 2018); *see also In re Applied Theory Corp.*, 312 B.R. 225, 238 (Bankr. S.D.N.Y. 2004). The Settlement Agreement, which was executed post-petition in January 2019 and resulted in payment of millions of dollars into the Debtors' estate, meets the foregoing standard.

10

The Chapter 11 Plan itself defines which indemnification claims are to be treated as unsecured or as administrative expense claims. Section 13.5 of the Plan states, in relevant part: "Indemnification claims arising out of postpetition conduct shall be treated as Administrative Expense Claims against the Debtors to the extent allowed." (APX1391). Appellant argues that the limiting language "Released Parties" should be inserted into that clause so as to read: "Indemnification claims [from Released Parties] arising out of postpetition conduct shall be treated as Administrative Expense Claims. . . ." (App. Br. at 51). It argues that that the Underwriters are not "Released Parties" because Appellant "objected to the improper release" and therefore, the potential indemnification claim could not receive administrative priority. (*Id*. at 51-52). Appellant's argument lacks merit based upon the plain language of the Plan. The Bankruptcy Court held correctly that the Debtors' indemnity obligations under the Settlement Agreement, triggered by Appellant's proposed lawsuit against the Underwriters, would adversely impact the bankruptcy estate as an administrative expense claim.

   III. <u>The Stay Applies to the Non-Debtor Third Party Landlord's Proposed Lawsuit</u>

Appellant argues that the Bankruptcy Court erred in its application of the automatic stay to its claim against the Underwriters because the Debtors' indemnification obligations are unenforceable, and even if they are enforceable, the consequences are not significant enough to justify application. Appellant's first argument is resolved by the earlier determination that the Settlement Agreement—and its indemnity clause—is enforceable. That the automatic stay is inapplicable to its proposed claim against the Underwriters because the indemnity clause would not "immediately and adversely" implicate the Debtors is likewise resolved by the Court's determinations that the proposed lawsuit would trigger the Debtors' defense and indemnity

11

obligations, and that those expenses would adversely impact the bankruptcy estate as an administrative expense claim.

The filing of a Chapter 11 bankruptcy petition automatically stays most judicial actions against the debtor. *See* 11 U.S.C. § 362(a)(1). Generally, the automatic stay "only protects the debtor and does not extend injunctive coverage to non-debtor third parties." *In re FPSDA I, LLC*, No. 10-BK-75439, 2012 WL 6681794, at *7 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012). However, "the stay 'can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.'" *Id.* (quoting *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003). The stay applies to such third parties, for example, whenever "the debtor may be said to be the real party defendant," *Queenie*, 321 F.3d at 288 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)), like in "a suit against a third-party who is entitled to absolute indemnity by the debtor," *A.H. Robins Co.*, 788 F.2d at 999. Application of the automatic stay to third party litigation is separately justified in situations where the debtor would have to divert significant staff and resources from its reorganization efforts to confront the burdens and expenses of litigation. *In re Johns-Manville Corp.*, 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984), *vacated in part*, 41 B.R. 926 (S.D.N.Y. 1984). Appellant argues that the Second Circuit's holding in *Queenie* is erroneously premised on *In re Johns-Manville Corp.* and *A.H. Robins Co.*, and that it should not be extended to this fact pattern. (App. Br. at 41, 48-49).

The Bankruptcy Court relied correctly upon the Second Circuit's decision in *Queenie*. Here, like in *Queenie*, the Debtors' indemnification obligations justify application of the automatic stay, without limiting application of the principle to complex reorganizations or exceptionally burdensome third-party litigation. *See Queenie*, 321 F.3d at 288. Even if the Court accepted the

standard pressed by Appellant, the Debtors established that these Chapter 11 cases—which involve more than fifty debtors, 68,000 employees, and claims of more than $85 Billion—is large and complex. (*See* Debtor Br. at 42; APX3177; APX3333). In short, and in light of the conclusions reached above, the Bankruptcy Court correctly interpreted *Queenie* to determine that the stay applies to the Underwriters in this situation, where there would be an immediate adverse impact on the Debtors' estate.

### IV.  Cause Does Not Exist to Lift the Stay

Appellant argues that the Bankruptcy Court erred in finding that Appellant failed to establish that cause exists to lift the stay. Under 11 U.S.C. § 362(d)(1), bankruptcy courts shall grant relief from the automatic stay under § 362(a) only when the party moving for vacatur of the stay shows cause to do so. While the Bankruptcy Code does not define "cause," the Second Circuit has enumerated twelve non-exclusive factors that courts weigh on a case-by-case basis in determining whether cause exists to lift the stay (the "*Sonnax* factors").[5] *In re Sonnax*, 907 F.2d 1280, 1285 (2d Cir. 1990). Not all of the *Sonnax* factors are relevant in every case. A court therefore should use only the factors that are deemed relevant to the particular case, and assign to each factor whatever weight the court feels is appropriate. *See In re RCM Glob. Long Term, Cap. Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996). The *Sonnax* Court itself

---

[5] The twelve factors are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *In re Sonnax*, 907 F.2d at 1286.

considered only four of the twelve factors as relevant. *See In re Sonnax Industries, Inc.*, 907 F.2d at 1286.

The Bankruptcy Court determined that the most relevant factor was, and the most weight should be given to, the impact of the stay on the parties and the balance of harms (the twelfth factor). Its determination implicated other of the non-exclusive *Sonnax* factors, such as interference with the bankruptcy proceedings (the second factor) and prejudice to the interests of other creditors (the seventh factor) as well. The Court cannot find any error of law or fact in the Bankruptcy Court's ruling, and in any event, its ruling is certainly within the range of permissible decisions.

Appellant's contentions all depend principally on the premise that the Settlement Agreement and its indemnity provision are unenforceable, which the Court has determined they are not; and its arguments for the availability of a lawsuit against the Underwriters in Puerto Rico. Were the stay lifted to permit Appellant's proposed lawsuit to proceed, the Debtors' indemnity obligations would be triggered; resolution of the proposed litigation would come at a cost to the Debtors, adversely impacting the bankruptcy estate as an administrative expense; and the rights and interests of other creditors would be unfairly impaired. *See, e.g.*, *In re Residential Cap., LLC*, No. 12-BK-12020, 2012 WL 3423285, at *7 (Bankr. S.D.N.Y. Aug. 14, 2012). Appellant has not met its burden to demonstrate that cause exists to lift the stay. Its $20 million claim for the cost of repairing Store No. 1915 will be reconciled together with all of the Debtors' other general unsecured creditors.

## **CONCLUSION**

Based on the foregoing, the Order of the Bankruptcy Court is AFFIRMED. The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED:**

Dated: White Plains, New York
September 27, 2021

_____
Philip M. Halpern
United States District Judge